**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSE
JACKSON DIVISION**

C/A NO. _____

| | |
|---|---|
| United States of America *ex rel*. | ) |
| Wood M. Deming, MD, individually and | ) |
| on behalf of Regional Cardiology | ) |
| Consultants, | ) |
| PC | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| -vs- | ) |
| | ) |
| Jackson-Madison County General Hospital, | ) |
| An Affiliate of West Tennessee Healthcare, | ) |
| Regional Hospital of Jackson, a Division of | ) |
| Community Health Systems Professional | ) |
| Svcs. Corp., James Moss, individually, | ) |
| Timothy Puthoff, individually, Joel | ) |
| Perchik, MD, Individually, and Elie H. | ) |
| Korban, MD, individually, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## FILED UNDER SEAL

## COMPLAINT

(False Claims Act, 31 U.S.C. §§3729-3733)

## PRELIMINARY STATEMENT

This lawsuit is based on the submission of false claims by Jackson-Madison County General Hospital (hereinafter "JMGH"), Regional Hospital of Jackson (hereinafter "RHJ") and Cardiologist Elie Hage Korban, MD (hereinafter "Korban"), to the federal Medicare, TriCare, and Medicaid programs and the fraudulent conduct of JMGH's Chief Executive Officer James Moss (hereinafter "CEO Moss"), RHJ's Chief Executive Officer Timothy Puthoff (hereinafter "CEO Puthoff"), Radiologist Joel Perchik, MD (hereinafter "Perchik"), each of whom condoned and/or furthered the fraudulent conduct of Korban (collectively "Individual Defendants").

The Individual Defendants engaged in a bilateral kickback and self-referral scheme violative of the Antikickback Statute at 42 U.S.C. §1320a-7(b)(b)(1)(2) and (3) and Stark II statute at 42 U.S.C. §1395nn, wherein CEO's Moss and Puthoff, despite the advice and counsel of members if their respective hospitals' medical staffs, chose to ignore blatant overutilization of cardiac medical services, including but not limited to cardiac sonography, scintigraphic stress imaging, angiography, angioplasty and stenting by Korban, shielding same from any scrutiny by the hospitals' clinical quality improvement mechanisms. The hospitals were thereby able to defraud the government and collect substantial government payments (for the technical components of said unnecessary procedures) to which they were not rightfully entitled and to the detriment of the government and its taxpayers.

In the hospitals' collective approval of, and failure to act against Korban, Korban himself was able likewise to defraud the government and collect substantial government payments (for the professional components of said unnecessary procedures).

2

Furthermore, Perchik (in concert with Puthoff) and the respective CEO's individually engaged in a pattern of bad-faith peer review of any physician who chose to oppose the hospitals' drive for excess and inappropriately collected remuneration (including the Relator), such that such physicians were eliminated from the medical staff if they chose to speak out as whistleblowers concerning any aspect of the scheme.

It appears that physicians Perchik (through the utilization of bad faith peer review at RHJ) and Korban (through abusive utilization and billing) conspired with CEO's Moss of JMGH and Puthoff of RHJ, by presenting or causing to be presented, in making or causing to be made, or used false records or statements to get a false or fraudulent claim paid or approved by Medicare, TriCare, and/or the Medicaid programs (hereinafter "federal payer programs"). The Relator, Wood M. Deming, MD, acting on behalf of and in the name of the United States of America, brings this civil action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§3729-3733, and alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §3732(a).

2.     This is an action to recover damages and civil penalties brought by Wood M. Deming, MD, (hereinafter "Relator"), an individual, by undersigned counsel, on behalf of the United States of America, against JMGH, an Affiliate of West Tennessee Healthcare, RHJ, a Division of Community Health Systems Professional Svcs. Corp., Moss, individually, Puthoff, individually, Perchik, individually and Korban, individually. This lawsuit arises from the unlawful scheme and conspiracy to defraud the United States of America, its taxpayers and the federal payer programs in particular, through

submission by JMGH and RHJ, separately and in concert with Korban, by and through his cardiology practice, of false and fraudulent federal payer program claims for reimbursement to the United States Government in violation of the False Claims Act, as amended 31 U.S.C. §3729, *et seq*. ("False Claims Act").

3. All of the alleged acts arose in the Western District of Tennessee. JMGM and RHJ are corporations organized and existing under the laws of the State of Tennessee, with their principal places of business and offices in the Western District of Tennessee. Accordingly, venue in this district is proper pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a). The physical address of RHJ is 367 Hospital Boulevard, Jackson, Tennessee, 38305 and the address of JMGH is 708 West Forest, Jackson, Tennessee, 38301.

## IN CAMERA REVIEW

4. Under the provisions of 31 U.S.C. §3730(b)(2), this Complaint is to be filed *in camera* and is to remain under deal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information establishing this cause of action.

5. Relator, Wood M. Deming, MD. (the "Relator"), is a citizen of the United States of America and the State of Tennessee, and is suing in the name of and on behalf of the United States of America. Relator hereby informs the government that from approximately late summer of 2003 to the present time, Korban was and is engaged in the private practice of diagnostic and interventional cardiology (the medical specialty

4

involved in the diagnosis and treatment of heart disease).  During said period and presently, Korban along with JMGH and RHJ, engaged in a scheme involving a pattern and practice of Korban's initially ordering numerous unnecessary diagnostic studies at the Defendant Hospitals including, but not limited to transthoracic echocardiography, scintigraphic stress imaging and transesophageal echocardiography upon elderly, debilitated nursing home patients then ordering the transport by ambulance of said nursing home patients to both JMGH and RHJ for unnecessary heart catheterization, diagnostic coronary angiography and various coronary and peripheral intervention procedures.  Korban also followed the same scheme in some cases with patients who were very young, in many cases in their twenties, who were at little, if any, risk for heart disease.  Many of these patients had negative stress imaging studies, yet underwent left heart catheterization to include coronary angiography, based upon the premise that the patents were still having chest pain and the records were fraudulently dictated to reflect these symptoms (which were not present).

6.     These patients lacked appropriate indications for diagnostic and therapeutic intervention.  In many, if not all cases, Korban subsequently performed unnecessary interventional procedures, including, but not limited to coronary artery catheterization, angiography, angioplasty and stenting.  In most, if not all of these cases the involved patients were hospitalized prior or thereafter, or both at either JMGH or RHJ needlessly and without appropriate indication, other than recuperation from the procedure they had unnecessarily undergone.

7.     CEO's Moss and Puthoff, and Perchik were aware of, conspired with, condoned and encouraged Korban in his scheme for their own personal, professional and

financial gain and that of their respective hospitals.  CEO'S Moss and Puthoff  were responsible for making or causing to be made, or submitting or causing to be submitted, fraudulent claims to the federal payer programs for cardiac diagnostic procedures, cardiac catheterization services (diagnostic and therapeutic) and in patient admissions to their hospitals which were unnecessary, or if initially necessary, were excessive in terms the extensiveness of the diagnostic and therapeutic procedures performed  (which were virtually always unnecessary) and/or the subsequent length of stay at the respective-involved hospital (necessitated by the unnecessary procedures performed by Korban) . The CEO's Moss and Puthoff and Perchik conspired with Korban as a member of the medical staff to overbill the federal payer programs for the benefits of the hospitals, Korban, individually, Perchik, individually, and themselves, individually.

8.     Said scheme represents a bilateral constructive kickback to both the involved hospitals and to Korban and a payment for referral to Korban in exchange for those patients being referred to the respective hospitals   The Defendant Hospitals, through the actions of Moss, Puthoff and Perchik ignored the repeated  reports by medical staff members, including, but not limited to the Relator, informing them of the overutilization of cardiac services by Korban, choosing to accept the substantial, but illegally-obtained remuneration from the federal payer programs while ignoring Korban's actions and the substantial remuneration he, himself received in performing the unnecessary procedures.   Such scheme is a violation of 42 U.S.C. §1320a-7(b)(b)(1)(2) and (3), the Antikickback Statute and Stark II, 42 U.S.C. §1395nn.

9.     Relator, as Chief of Cardiology at JMGH, along with o ther medical staff members and cardiac catheterization lab personnel cautioned Korban as to his

overutilization of services there and noticed administration  (including Moss and Puthoff) at JMGH and RHJ as to Korban's scheme but w ere ignored on multiple occasions.

10.     Relator suffered retaliation by JMGH and RHJ for whistleblowing behavior wherein he repeatedly brought concerns regarding overutilization of diagnostic and therapeutic services by Korban in the form of a bad -faith peer review action. Perchick was the initiator, perpetrator and propagator of the bad-faith peer review action and an active economic competitor of Relator's, in an attempt to rid himself of the Relator's economic competition and to quiet his concerns over Korban's overutilization. Other physicians additionally suffered bad -faith peer review and dismissal from the medical staff when they chose to oppose administrative policies sacrificing quality patient care for profit.

11.     Additionally, CEO Moss, on behalf of the Board at JMGH p urchased a medical office building (hereinafter "MOB") and adjacent parking lots in 1998 from a multispecialty medical practice know as Medical Specialty Clinic, PC (hereinafter "MSC"), the senior member of which was at one time the Chief of the Medical St aff at JMGH, Charles Hertz, MD.  JMGH paid an amount far in excess of fair market value for the purchase of said MOB and appurtenant parking lots.

12.     In 1998, JMGH subsequently built another MOB on the campus of JMGH, the sole tenant of which was MSC.  MSC and JMGH initially entered into a lease - purchase arrangement wherein MSC could purchase said newer MOB under terms not customary and below standard fair market value.  Furthermore, JMGH subleased space in said newer MOB in an amount far in excess of fa ir market value so as to actually offset the value of the already very favorable lease arrangement it had with MSC  by payment of

substantial funds, not appropriate and in excess of fair market value for the sub-leasehold arrangement between JMGH and MSC. This arrangement was carried out in exchange for patient referrals to JMGH by MSC in violation of the Antikickback Statute, 42 U.S.C. §1320a-7(b)(b)(1)(2) and (3).

13. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media, rather they are the declarations of the Relator as an original source.

14. Relator has direct and independent knowledge within the meaning of 31 U.S.C. §3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based, and he has voluntarily through his attorney provided the information to the government prior to filing this Complaint.

15. As required by 31 U.S.C. §3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of Western District of Tennessee, simultaneous with the filing of this Complaint, a declaration of material evidence and information related to this Complaint.

16. Korban, JMGH and RHJ provide medical and healthcare services to the public and receive a substantial amount of funds from the federal payer programs. The submission by these Defendants to said federal payer programs for payment or reimbursement involves a representation and certification the Defendants will abide by and have abided by and that they will adhere to and have adhered to all of the statues, rules, and regulations governing the federal payer programs. All of the actions attributed

8

to these Defendants in this Complaint were taken by themselves or employees and/or agents of these Defendants including those of Moss, Puthoff and Perchik, though not always acting within the scope of their employment and/or agency.

17.     The United States Department of Health and Human Services (hereinafter "HHS") acting by and through the Centers for Medicare and Medicaid (hereinafter "CMS") is an agency of the United States of America responsible for administering the federal Medicare Programs, see 42 U.S.C. §1395, *et seq*, under which healthcare facilities and providers may be reimbursed with federal funds for services provided to eligible patients or Medicare beneficiaries.

## APPLICABLE REGULATORY BACKGROUND

18.     The Medicare Program which provides federal reimbursement for medically necessary services and supplies used by eligible persons or Medicare beneficiaries ("beneficiaries" or "patients") was established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. §1395, *et seq*. Medicare health reimbursement is governed by statute and by regulations issued by HHS.

19.     CMS is responsible for the administration of the Medicare Program and contracts with private companies in each state known as "intermediaries" and "carriers" to administer Part A and Part B of the Medicare Program, respectively.

20.     Medicare allows payments under Part A to acute care hospitals, including the facility owned by the Hospital Defendants, based on annual cost reports filed with intermediaries, citing to claims for services rendered to federal payer program beneficiaries, and based on these Defendant's designation as certified federal payer program providers.   Payments for claims for services are based upon appropriate

9

diagnostic related groupings (hereinafter "DRGs") for inpatient stays, on the basis of a fee for service arrangement based on prevailing charges established by the intermediaries for services and based on the admission meeting generally accepted admission criteria. Here, the cardiac diagnostic and therapeutic procedures performed by Korban and approved of by the other Defendants were not medically necessary and therefore the resulting admissions were unnecessary as well.

21.     Medicare allows payments under Part B (supplementary medical insurance for the aged and disabled) to cover non-institutional services such as physician services and said payment is customarily made on reasonable charge basis only when medical necessity criteria are met.  Here, those patients upon whom Korban performed various diagnostic and therapeutic cardiac procedures lacked appropriate indications for said services and thus said services failed to meet relevant medical necessity criteria, yet were paid for the federal payer programs in violation of federal law.

22.     When individual physicians and group practices of physicians request payment from Medicare Part B for services provided to Medicare beneficiaries, the individual physicians or group practices of physicians are required to submit their application or claim for payment to the Medicare carrier on a proper claim form designated by CMS.  See, 42 C.F.R. § 424.32.  JMGH and RHJ, through their agents, servants or employees, acting within the scope of their employment, would have been responsible for submitting such claims on behalf of the hospitals while the treating physician, in this case, Korban would have submitted similar claims for services he allegedly performed regardless of their medical necessity.

23.    42  U.S.C.  §1320a-7(b)(b)(1)(2)  and  (3),  the  Antikickback  Statute, prohibits anyone from knowingly and willfully making or causing to be made any false statement  or  representation  of  a  material  fact  in  any  applic ation  for  any  benefit  or payment  under  a  federal  healthcare  program.   The  Defendants  are  in  violation  of  the Antikickback Statute.

24.    The  provisions  of  42  U.S.C.  §1320a-7(b)(b)(1)(2)  and  (3),  commonly known as the Anti-kickback statute, provide as follow s:

**(b)    Illegal remunerations**

**(1)    whoever  knowingly  and  willfully  solicits  or  receives  any remuneration  (including  any  kickback,  bribe,  or  rebate) directly or indirectly, overtly or covertly, in cash or in kind -**

**(A)  in  return  for  referring  an  individual  to  a  perso n  for  the furnishing  of  any  item  or  service  for  which  payment  may be  made  in  whole  or  in  part  under  a  Federal  health  care program, or**

**(B)  in  return  for  purchasing,  leasing,  ordering,  or  arranging for  or  recommending  purchasing,  leasing,  or  ordering  any good,  facility,  service,  or  item  for  which  payment  may  be made  in  whole  or  in  part  under  a  Federal  health  care program,  shall  be  fined  not  more  than  $25,000  or imprisoned for not more than five years, or both.**

**(2)    whoever  knowingly  and  willfully  offers  or  pays  a ny remuneration  (including  any  kickback,  bribe,  or  rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -**

**(A)  to  refer  an  individual  to  a  person  for  the  furnishing  or arranging  for  the  furnishing  of  any  it em  or  service  for which  payment  may  be  made  in  whole  or  in  part  under  a Federal health care program, or**

**(B)  to  purchase,  lease,  order,  or  arrange  for  or  recommend purchasing,  leasing,  or  ordering  any  good,  facility, service,  or  item  for  which  payment  may  be  ma de  in  whole or in part under a Federal health care program,**

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3)     Paragraphs (1) and (2) shall not apply to -

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

(C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program if -

(i)     the person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and

(ii)    in the case of an entity that is a provider of services (as defined in section 1395x(u) of this title), the person discloses (in such form and manner as the Secretary requires) to the entity and, upon request, to the Secretary the amount received from such vendor with respect to purchases made by or on behalf of the entity;

(D) a waiver of any coinsurance under Part B of subchapter XVIII of this chapter by a Federally qualified health care center with respect to an individual who qualifies for subsidized services under a provision of the Public Health Service Act 42 U.S.C.A. §201 et seq.;

(E) any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987; and

(F) any remuneration between an organization and an individual or entity providing items or services, or a

> **combination thereof, pursuant to a written agreement between the organization and the individual or entity if the organization is an eligible organization under section 1395mm of this title or if the written agreement, through a risk-sharing arrangement, places the individual or entity at substantial financial risk for the cost or utilization of the items or services, or any combination thereof, which the individual or entity is obligated to provide.**

25.     Since January 1, 1997, when the Health Insurance Portability and Accountability Act of 1996 (hereinafter "HIPAA") became effective, the Antikickback rules were extended to all federal programs, including TriCare and Medicaid, except for the Federal Employee Health Benefit Program.

26.     Effective July 1, 1995, 42 U.S.C. §1395nn, commonly known as "Stark II" prohibits a physician from referring Medicare and Medicaid patients for designated health services to entities in which the referring physician has a financial relationship. Here, Korban had a financial relationship with the hospitals in that they allowed him knowingly to order and perform procedures which lacked appropriate indications and failed to meet medical necessity requirements. Conversely, the acceptance by a hospital of a Medicare or Medicaid patient as a result of a referral from a physician having a "financial relationship" (as defined by statute) with the entity providing healthcare is unlawful. Stark II prohibits a hospital (or other healthcare provider) from submitting Medicare claims for payment based on such referrals. The statute also expressly prohibits the payment of any Medicare claims submitted in violation of 42 U.S.C. §1395nn(a)(1). Here, prohibited claims were submitted and paid by the government to the Defendant Hospitals and Korban,

27.     42 U.S.C. §1395nn(b) provides ten general exceptions which allow referrals between physician and such entities which maintain financial relationships. If

the financial relationship between the ph ysician and entity does not fall within one of the exceptions, then a physician may not make a referral to any entity with which the physician may have a financial relationship for the "furnishing of designated health services.  Designated health services  consist of: (a) clinical laboratory services, (b) physical therapy services, (c) occupational services, (d) radiology or other diagnostic services, (e) radiation services, (f) durable medical equipment, (g) parenteral and enteral nutrients, equipment, and supplies, (h) prosthetics, orthotic, and prostatic devices, (i) home health services, (j) out-patient prescription drugs, and (k) inpatient and out patient hospital services.  Moreover, the regulations implementing 42 U.S.C. §1395nn expressly require that any entity collecting payment for a service "performed under a prohibited referral must refund all collected amounts on a timely basis".  42 C.F.R. §  411.353.

28.     The applicable provisions of Stark II specify "financial arrangements" as "an ownership or investment interest in the entity to which a referral is made" or a "compensation arrangement between the physician and the entity."   If the financial arrangement consists of a compensation arrangement as it does instantly, Stark II provides that the physician or entity which is a party to the compensation arrangement and which submits a bill for services is in violation of Stark II , unless the terms of the arrangement meet certain requirements, which here they do not.  The terms of such personal service arrangements are permissible under Stark II if the arrangement is set out in writing, signed by the parties, specifies the services covered by the arrangement, the arrangement covers all services to be provided by the physician to the entity, the aggregate services do not exceed those reasonable and necessary for legitimate business purpose, is for a term of at least one (1) year, the amount of the reimbursement is

14

commercially reasonable and "does to exceed fair market value".    See 42 U.S.C. §1395nn(e)(3) and 42 C.F.R. §411.357.

29.    As a condition of participation in the Medicare Program, JMGH and RHJ and all physicians employed or independently contracted by either entity, completed and signed Medicare enrollment applications which contained the certification a nd representation by JMGH and RHJ and the employed/contracted physicians that they individually accepted the responsibility for insuring (a) adherence to all Medicare laws and guidelines which dictate the proper operation of their businesses; (b) adherence  to guidelines as outlined by the federal government; and (c) that there would be no prohibited referrals nor prohibited billings to Medicare.   Korban as a member of he medical staff at JMGH and RHJ was an independently contracted physician at both entities.    He, JMGH and RHJ violated, inter alia, these relevant conditions of participation.

30.    As a further condition of participation in the Medicare Program and as a condition precedent to the receipt of reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, JMGH and RHJ are required to complete and have actually completed on an annual basis cost reports on CMS Form 2552 which contained representations and certifications by an officer of JMGH and RHJ that he or she was "familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in this cost report were provided in compliance with such laws and regulations".   The submission of such form and information contained therein is an essential element in the Medicare claims process. The CMS claims form contains language similar to the following:

15

**"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED <u>OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL</u>, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT."**

31.    The Administrators of JMGH and RHJ on each CMS claim form were required to, and have, certified that he or she is:

> "familiar with the laws and regulations regarding the provision of healthcare services, and that **the services identified in this cost report were provided in compliance with such laws and regulations**." (Emphasis added.)

32.    Most hospitals, including the Defendant Hospitals and those physician practices either owned or contracting with the Defendant Hospitals, operate under the prospective payment system (PPS) for cost reporting periods occurring on or after October 1, 1983. Under the PPS, Medicare pays a fixed amount of money for hospital admissions of Medicare beneficiaries determined by the Diagnostic Related Group (DRG) into which the beneficiaries fall. This means that a pre-determined, fixed and set all or nothing Medicare payment is made to hospitals based on the DRG assigned to the specific beneficiary so long as the hospital admission is medically necessary (emphasis added).

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF FALSE CLAIMS ACT
### VIOLATION OF ANTI-KICKBACK STATUTE AND STARK II
### (31 U.S.C. §3729(A)(1), 42 U.S.C. §1320A-7B AND 42 U.S.C 1395NN)

33.     This is a civil action by Wood M. Deming, MD, acting on behalf of and in the name of the United States of America, against JMGH, RHJ and individual Defendants Moss, Puthoff, Korban and Perchik.

34.     The allegations of Paragraphs One (1) through Thirty-two (32) are herein realleged as fully and effectually as if set forth herein verbatim.

35.     Between 2003 and up to the present, JMGH, RHJ, Korban, Perchik, Moss and Puthoff participated in, sought reimbursement from, and actually received funds from the Medicare Part A and Medicare Part B, TriCare, and Medicaid programs for providing services and supplies to Medicare, TriCare, and Medicaid beneficiaries who were admitted to one or both of the Defendant Hospitals by a physician (Korban) with whom it had an illegal compensation arrangement and tacit agreement.  As a result of providing services and supplies to the federal payers, JMGH, RHJ and Korban submitted, caused to be submitted, or assisted or supervised the submission of claims to Medicare, TriCare, and Medicaid for payment.

36.     More specifically, for at least the past four years, JMGH and RHJ sought reimbursement from, and actually received funds from the Medicare Part A and Part B, TriCare, and the Medicaid programs for providing inpatient and outpatient services and supplies to Medicare, TriCare, and Medicaid beneficiaries in their respective hospital facilities.  Additionally, Korban participated in, sought reimbursement from, and actually

received funds from Medicare, TriCare, and Medicaid for providing services and supplies to Medicare, TriCare, and Medicaid beneficiaries in the hospital facilities, hospital ancillary facilities, and office ancillary facilities for inpatient and outpatient services he performed. As referenced above, the process for requesting p ayment for these services rendered to Medicare, TriCare, and Medicaid beneficiaries required the submission of individual claim forms by the Defendant Hospitals and Korban for each patient on the appropriate DRG for inpatient stays, the submission of a cla im based on a fee for service based on prevailing charges for inpatient and out patient services, and on the representation that the services or supplies provided to the Medicare, TriCare, or Medicaid beneficiaries were medically necessary . Instantly and with the knowledge of the Defendant Hospitals, those cardiac services ordered and performed by Korban were never medically necessary.

37. At all times during the relevant period and continuing to the present, JMGH and RHJ individually, jointly and/or in concert with one or more physicians, including but not necessarily limited to Perchik committed fraud and abuse in the compensation arrangement they shared with Korban by devising a plan or scheme intended to reward Korban who admitted a large volume of patients to its hospital, despite many of those never meeting medical necessity requirements for certain procedures and/or admission. JMGH AND RHJ actually knew or should have known by virtue of its Utilization Review Committee of the Medical Staff and it Clinical Quality Improvement Department, that most of Korban's procedures and admissions being made were either not medically necessary. Furthermore, as part and parcel of such illegal arrangement, JMGH and RHJ caused to be paid to Korban, compensation far in excess of

fair market value and reasonable for a Cardiologist practicing in a community like Jackson, TN.

38.     In furtherance of its plan and scheme with Korban, JMGH and RHJ received payment in excess of what would be reasonable and/or expected for cardiac services, when it knew or should have known that the majority of such procedures performed by Korban and the resulting inpatient admissions were not medically necessary and the condition of such patients was being misstated or exaggerated in an effort to justify the admission and particularly the extensive work-ups and procedures Korban was performing upon them.

39.     The overutilization of cardiac procedures and inpatient admissions by Korban with whom the Defendant Hospitals had compensation arrangements, was done solely for the purpose of maintaining a substantial patient census, performing the maximal number of diagnostic and therapeutic cardiac procedures (usually with unnecessary intervention such as angioplasty and/or stenting) and the resulting revenues realized from such unnecessary testing, procedures and admissions.

40.     The conduct and actions of JMGH and RHJ were in direct violation of the statutes and regulations affecting the federal administration of Medicare, TriCare, and Medicaid health payment funds, and resulted in it applying for and receiving Medicare, TriCare, and Medicaid payments far in excess of that to which they would have been entitled had the compensation arrangement and scheme not existed or had the testing, procedures, inpatient admissions and in some cases, length of stay been medically necessary.

41.     The conduct of Korban, JMGH and RHJ was in direct violation of the statutes and regulations by knowingly and willfully compensating a physician in excess of fair market value and for medically unnecessary testing, procedures and admissions .

42.     If the United States of America had been aware of the violations by Korban, JMGH and RHJ of the statutes and regulations regarding the federal payer program claims submitted by Korban, JMGH and RHJ for services rendered by them,  it would have withheld payment and taken immediate action against them   Korban, JMGH and RHJ concealed their illegal activities from the United States of America in an effort and for the specific purpose of defrauding the United States of America into paying federal payer program claims that it otherwise would not have paid.  The submission of Medicare, TriCare, and Medicaid claims by JMGH and RHJ involves a representation and certification that it would abide by and has abided by, and that it will adhere and has adhered to all of the statues, rules and regulations governing the federal payer programs.

43.     JMGH and RHJ's submission of cost reports to CMS for the relevant period from late summer 2003 up to and including the present, included services to patients whose physicians (in this case, Korban) had received kickback or illegal inducements prohibited by 42 U.S.C. §1320a -7b(b), 42 U.S.C. § 1395nn and/or other laws, thus rendering the CMS cost report as "false r ecords or statements" for purposes of the False Claims Act, 31 U.S.C. §§3729 -3733.

44.     By submission of cost reports for services rendered to patients, which services and billing therefor were unlawful by virtue of the existence of a prohibited compensation arrangement and for services and supplies which were not medically necessary, required an otherwise unnecessary hospital admission  or exceeded the

necessary length of stay, the cost reports were rendered as "false records or statements". Specifically, the statements contained in the cost reports that "the services identified in this cost report were provided in compliance with such laws and regulations" and "were medically necessary" were false and thus violative of the False Claims Act, 31 U.S.C. §§3729-3733.

45.     As a result of the representations of JMGH and RHJ and Korban, the physician with whom they were acting in concert to defraud the United States Government, both in the enrollment application and annual cost reports, Medicare, TriCare, and Medicaid relied upon JMGH and RHJ and Korban, the treating physician, that they had complied and would comply with and adhere to all laws and guidelines, and did rely upon the representations that there would be no prohibited billings to the federal payer programs in violation of any law and regulation and, based upon these representations, the United States made payments to Korban, JMGH and RHJ for claims submitted to it that it would not have made had it known that the representations and certifications completed on the Medicare enrollment applications and on annual cost reports were false.

46.     As a result of the conduct of Korban, JMGH and RHJ, it has knowingly been presented or caused to be presented to an officer or employee of the United States of America, false or fraudulent claims for payment or approval in violation of False Claim Act sections 31 U.S.C. §3729(a)(1) and 42 U.S.C. §1320a-7b(b)(1).

47.     The United States of America has been damaged as a result of the violation of the False Claims Act by Korban, JMGH and RHJ and Plaintiff is entitled to be reimbursed for monies obtained by Korban, JMGH and RHJ and for the amount of

21

money by which it has over-compensated them for fraudulent claims it presented or caused to be presented for payment or approval to the United States of America.

48.     Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C. §3729(a)(1) by Korban, JMGH and RHJ.

49.     Plaintiff is entitled to a civil penalty between $5,000.00 and $10,000.00 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim of Korban, JMGH and RHJ.

50.     Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

## SECOND CAUSE OF ACTION
### (31 U.S.C. §3729(A)(2)

51.     The allegations of Paragraphs One (1) through Fifty (50) are herein realleged as fully and effectually as if set forth herein verbatim.

52.     Relator alleges that in performing the acts hereinbefore set forth, Korban, JMGH and RHJ knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(2) , 42 U.S.C. 1395nn and 42 U.S.C. §1320a-7b(b)(1).   As a result Korban, JMGH and RHJ have knowingly presented or caused to be presented to an officer or employee of the United States of America, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(2), 42 U.S.C. 1395nn and 42 U.S.C. §1320a-7b(b)(1).

53.     The United States of America has been damaged as a result of the violation of the False Claims Act by Korban, JMGH and RHJ and the United States of America is entitled to be reimbursed for monies obtained by Korban, JMGH and RHJ for

fraudulent claims they presented or caused to be presented for payment or approval.

54.     The Relator is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by Korban, JMGH and RHJ.

55.     Plaintiff is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(2) for each fraudulent claim of Korban, JMGH and RHJ.

56.     Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

## THIRD CAUSE OF ACTION
### (31 U.S.C. §3729(A)(3))

57.     The allegations of Paragraphs One (1) through Fifty-six (56) are herein realleged as fully and effectually as if set forth herein verbatim.

58.     Plaintiff alleges that in performing the acts hereinbefore set forth, JMGH and RHJ knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(3), 42 U.S.C. § 1395nn and 42 U.S.C. §1320a-7b(b)(1).  As a result Korban, JMGH and RHJ have knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(3), 42 U.S.C.§ 1395nn and 42 U.S.C. §1320a-7b(b)(1).

59.     The United States of America has been damaged as a result of the violation of the False Claims Act by Korban, JMGH and RHJ and Plaintiff is entitled to be reimbursed for monies obtained by Korban, JMGH and RHJ for fraudulent claims they presented or caused to be presented for payment or approval.

60. Plaintiff is entitled to treble damages based upon the amoun t of damages sustained by the United States of America as a result of violations of law by Korban, JMGH and RHJ.

61. Plaintiff is entitled to a civil penalty between \$5,000 and \$10,000 as required by 31 U.S.C. §3729(a)(3) for each fraudulent claim of Korban, JMGH and RHJ.

62. Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

## FOURTH CAUSE OF ACTION
### (31 U.S.C. §3729(A)(7))

63. The allegations of Paragraphs One (1) through Sixty-two (62) are herein realleged as fully and effectually as if set forth herein verbatim.

64. Plaintiff alleges that in performing the acts hereinbefore set forth, Korban, JMGH and RHJ knowingly made, used, or caused to be made or used false records or statements to get a false or fraudu lent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(7) , 42 U.S.C. § 1395nn and 42 U.S.C. §1320a-7b(b)(1). As a result Korban, JMGH and RHJ have knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(7), 42 U.S.C. § 1395nn and 42 U.S.C. §1320a-7b(b)(1).

65. The United State of America has been damag ed as a result of the violation of the False Claims Act by Korban, JMGH and RHJ and Plaintiff is entitled to be reimbursed for monies obtained by Korban, JMGH and RHJ for fraudulent claims it presented or caused to be presented for payment or approval.

66.    Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by Korban, JMGH and RHJ.

67.    Plaintiff is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(7) for each fraudulent claim of Korban, JMGH and RHJ.

68.    Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

### FIFTH CAUSE OF ACTION
### 31 U.S.C.3730(h) – RETALIATION INVOLVING TERMS AND CONDITIONS OF DE FACTO EMPLOYMENT

69.    The allegations of Paragraphs One (1) through Sixty - eight (68) are herein realleged as fully and effectually as if set forth herein verbatim.

70.    Relator was an independent contracting physician akin to a de fact o employee of both Defendant Hospitals who was discharged, harassed, threatened and discriminated against utilizing bad-faith peer review to pretextually revoke his privileges at both institutions.  As such, he has been adversely affected in the terms and conditions of his contracting/de facto employment by the Defendant Hospitals because of lawful acts done by him in furtherance of this action at law to recover monies properly due to the United States of America.

71.    These included his investigation and attempted assistance in exposing the scheme wherein the Defendant Hospitals and Korban conspired to maximize their compensation at the expense of the United States of America through violation of 31 U.S.C. §3729(a)(7), 42 U.S.C. § 1395nn and 42 U.S.C. §1320 a-7b(b)(1).

72.     As such and under this section, Relator is entitled to all relief necessary to make him whole. Such relief shall include reinstatement to the respective medical staffs of the Defendant Hospitals with the same seniority status he would have had but for the discrimination, twice the amount of back pay based upon his prior hospital productivity, interest on the back pay, and compensation for any and all special damages sustained as a result of the discrimination through the utilization of bad-faith peer review and revocation of his privileges, including litigation costs and reasonable attorneys' fees.

**WHEREFORE**, Plaintiff demands judgment against all of these Defendants as follows:

(a)     That by reason of the violations of the False Claims Act as set out in the five causes of action, this Court enter judgment against Jackson Madison County General Hospital, Regional Hospital of Jackson, James Moss, Timothy Puthoff, Joel Perchik, MD, and Elie Hage Korban, MD, in an amount equal to three times the amount of damages the United States of America has sustained because of their actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000) and not more than Ten Thousand Dollars ($10,000) for each violation pursuant to 31 U.S.C. §3729(a);

(b)     That Relator, as Qui Tam Plaintiff, be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and any other applicable provision of law;

(c)     That Relator be awarded all costs of this action, including a reasonable attorney's fee and Court costs; and

(d)     That the United States of America and Relator have such other relief as the Court deems just and proper.

Respectfully Submitted,

BARD AND ASSOCIATES, PC

/s Ralph M. Bard, MD JD _____

Ralph M. Bard, MD JD
Federal Bar #
307 Kingsridge Blvd.
Tullahoma, TN 37388
931-454-2280

MEDICOLEGAL CONSULTANTS, LLC

/s C. William Hinnant, Jr. MD JD \_\_\_\_

C. William Hinnant, Jr. MD JD
Federal Bar # 9129
112 Essex Drive
Anderson, SC 29621
(864) 226-6132

ATTORNEYS FOR RELATOR

Dated: _____, 2007
Anderson, South Carolina